IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

KENNETH EARL FULTS,

   Petitioner,

      v.

WARDEN STEPHEN UPTON,

   Respondent.

CIVIL ACTION FILE
NO. 3:09-CV-86-TWT

## ORDER

This is a petition for a writ of habeas corpus.  It is before the Court on the

Petitioner's Amended Petition for Writ of Habeas Corpus [Doc. 22].  For the reasons

set forth below, the Court DENIES the Amended Petition.

## I.  Background

This case arises out of the murder of Cathy Bounds on January 30, 1996 in

Spalding County, Georgia.  The Petitioner pleaded guilty to her murder.  The Georgia

Supreme Court summarized the facts as follows:

> The evidence adduced at Fults' sentencing trial showed that he carried
> out a week-long crime spree which was centered, at least in part, upon
> his desire to murder a man who was engaged in a relationship with his
> former girlfriend. Fults first committed two burglaries, obtaining several
> handguns.  After a failed attempt at murdering his former girlfriend's
> new boyfriend with one of the stolen handguns, Fults then burglarized
> the home of his next-door neighbors.  After the male neighbor left for

work, Fults forced his way through the front door wearing gloves and a hat pulled down over his face.  Fults confronted the female occupant of the home, Cathy Bounds, brandishing a .22 caliber handgun he had stolen during one of the burglaries.  Ms. Bounds begged for her life and offered Fults the rings on her fingers.  Fults turned Ms. Bounds around toward the bedroom, either taped or forced her to tape her eyes closed by wrapping over six feet of electrical tape around her head, forced her into the bedroom, placed her face-down on her bed, placed a pillow over her head, and shot her five times in the back of the head.

A search of Fults' trailer home revealed a boastful letter he had written in gang code in which he described the murder with some alterations of detail.  Upon being confronted with this letter by a law enforcement officer, Fults confessed to killing Ms. Bounds but maintained that he had shot her by accident while in a dream-like state.  The murder weapon was recovered from under Fults' trailer home, and .22 caliber shell casings shown to have been fired by the murder weapon as well as items from the earlier burglaries were found behind Fults' trailer home.

Fults v. State, 274 Ga. 82, 83 (2001).

Petitioner Kenneth Fults was formally arraigned on May 19, 1996 in the Superior Court of Spalding County.  Pre-trial motions were heard on July 24, 1996, and trial began nearly a year later on May 12, 1997. But, just before opening statements were set to begin, the Petitioner pled guilty to the charges of malice murder, burglary, kidnapping with bodily injury, and possession of a firearm in the commission of a crime.  The Petitioner's sentencing hearing began on May 19, 1997. After three days of evidence and argument, the jury found two aggravating circumstances to impose the death penalty: (1) the murder was committed during the commission of the capital felonies of kidnapping with bodily injury and during the

commission of a burglary and (2) the murder was outrageously and wantonly vile, horrible, or inhuman in that it involved depravity of mind.  See O.C.G.A. § 17-10-30(b).  The jury returned a verdict in favor of the death penalty.  The Petitioner was subsequently sentenced to death for malice murder.  He also received consecutive sentences of life imprisonment without parole for kidnapping with bodily injury, twenty years for burglary, and five years for possession of a firearm during the commission of a crime.  Johnny Mostiler represented the Petitioner at trial and sentencing.  Shortly after sentencing Mr. Mostiler died.  Harold Sturdivant replaced Mr. Mostiler and represented Fults at the motion for new trial and on direct appeal.

The Petitioner filed a motion for new trial on June 19, 1997 and an amended motion for new trial on March 16, 2000.  The trial court denied the motion.  The Petitioner filed a notice of appeal to the Georgia Supreme Court on April 14, 2000.  Because Fults had new counsel for his appeal, the Georgia Supreme Court remanded the Petitioner's case back to the trial court for consideration of any claim of ineffective assistance of trial counsel.  The trial court conducted a hearing on the effectiveness of Petitioner's trial counsel on December 1, 2000, and again denied the Petitioner's motion for a new trial.  The Petitioner filed a notice of appeal to the Georgia Supreme Court on December 29, 2000.  The Georgia Supreme Court affirmed the Petitioner's convictions and sentences on June 11, 2001.  Fults, 274 Ga. at 82.

The United States Supreme Court denied Fults' petition for a writ of certiorari and petition for rehearing.  Fults v. Georgia, 535 U.S. 1043 (2002).

On November 26, 2002, the Petitioner filed a petition for a writ of habeas corpus in the Superior Court of Butts County, Georgia.  The court held an evidentiary hearing that lasted from March 20, 2007 through March 22, 2007.  It denied the petition on December 28, 2007, finding that some claims were procedurally defaulted and deciding other claims on the merits.  The Georgia Supreme Court denied the Petitioner's application for certificate of probable cause to appeal, and the United States Supreme Court denied Fults' petition for writ of certiorari.  Fults v. Upton, 130 S. Ct. 275 (2009).

The Petitioner now seeks a writ of habeas corpus from this Court.  On November 13, 2009, the Petitioner filed an Amended Petition for Writ of Habeas Corpus [Doc. 22].  On September 2, 2010, the Court granted in part and denied in part the Respondent's Motion to Dismiss Procedurally Defaulted and Unexhausted Claims [Doc. 30].  Specifically, the Court found that the Petitioner had procedurally defaulted all or parts of Claim II, Claim III, Claim VIII, Claim IX, Claim X, Claim XI, Claim XII, Claim XIII, Claim XIV, Claim XV, Claim XVI, Claim XVII, Claim XVIII, Claim XIX, Claim XX, Claim XXI, Claim XXII, Claim XXVI, Claim XXVII, Claim XXVIII, Claim XXXI, and Claim XXXII [see id.].  On February 4, 2011, the Court

denied the Petitioner's Motion For Reconsideration [Doc. 45].  Fults then filed a Motion for Leave to Conduct Discovery [Doc. 36].  On March 18, 2011, the Court denied this request.

Pursuant to the Court's September 2, 2010 Order [Doc. 30], eight claims remain, in whole or in part, to be addressed on the merits.  Those claims include Claim I (mental retardation), Claim II (ineffective assistance of trial counsel as raised on direct appeal), Claim VI (ineffective assistance of appellate counsel as raised in the state habeas corpus proceeding), Claim VII (ineffective assistance of appellate counsel as raised in the state habeas corpus proceeding), Claim XI (trial court restrictions on voir dire as raised on direct appeal)[1], Claim XXI (introduction of inflammatory and prejudicial evidence as raised on direct appeal), Claim XXIII (improper jury instructions), and Claim XXIX (proportionality review).  Further, the Petitioner has briefed Claim XXII (racial bias in jury) and Claim III (ineffective assistance of trial counsel due to workload) despite the Court's ruling that these claims were procedurally defaulted [see Doc. 30].

## II.  Habeas Corpus Legal Standard

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas corpus relief for claims previously

---

[1]As discussed below, the parties did not address this claim in their briefs.

adjudicated on the merits by a state court unless the state court adjudication resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first step in resolving a federal habeas corpus claim is to determine the "clearly established law at the relevant time." Neelley v. Nagle, 138 F.3d 917, 922 (11th Cir. 1998); see Williams v. Taylor, 529 U.S. 362, 379 (2000). To do so, a district court evaluating a habeas corpus petition under 28 U.S.C. § 2254(d)(1) "'should survey the legal landscape' at the time the state court adjudicated the petitioner's claim to determine the applicable Supreme Court authority; the law is 'clearly established' if Supreme Court precedent would have compelled a particular result in the case." Neelley, 138 F.3d at 923. "Clearly established Federal law" does not refer to decisions of the lower federal courts but, rather, is limited to "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (quoting Williams, 529 U.S. at 412). The second step of the analysis is to determine whether the state court adjudication was "contrary to" or an "unreasonable application of" the clearly established Supreme Court case law. Neelley, 138 F.3d at 923. A state court decision is contrary to clearly

established federal law when it applies a rule that contradicts the governing law as set forth in cases before the Supreme Court of the United States. Williams, 529 U.S. at 405; Putman, 268 F.3d at 1241. Additionally, a "contrary to" finding will result if the state court confronts materially indistinguishable facts but arrives at a result different from that of the Supreme Court. Williams, 529 U.S. at 406; Putman, 268 F.3d at 1241. Finally, the Supreme Court has explained that the "unreasonable application" prong applies when the "'state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413). In order to qualify as unreasonable, the state court decision must have been more than incorrect or erroneous.  Id.  Rather, the state court's application of clearly established federal law must have been "objectively unreasonable." Id. at 521 (citing Williams, 529 U.S. at 409).  Finally, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## III.  Discussion

A.    Claim I: Mental Retardation

The Petitioner claims that he is mentally retarded. Both the Georgia Constitution and the United States Constitution prohibit the execution of mentally retarded individuals. <u>See</u> <u>Fleming v. Zant</u>, 259 Ga. 687, 690 (1989); <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002). Under Georgia law,[2] "'[m]entally retarded' means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." O.C.G.A. § 17-7-131(a)(3). The Petitioner must prove that he is mentally retarded beyond a reasonable doubt. <u>Stripling v. State</u>, 289 Ga. 370, 372 (2011).

First, Fults claims that the standard applied by the state habeas court was contrary to clearly established federal law. <u>See</u> 28 U.S.C. § 2254(d)(1). The state habeas court found that: "Petitioner must meet the extremely high standard of establishing that he is actually, beyond a reasonable doubt, mentally retarded." (Res. Ex. 83, at 54.) Specifically, the Petitioner argues that "the constitutionality of [Georgia's beyond a reasonable doubt] standard of proof is questionable, at best." (Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 41.) Under § 2254 of the

---

[2]The Supreme Court has not established a federally mandated standard for determining mental retardation. <u>Atkins</u>, 536 U.S. at 317 (quoting <u>Ford v. Wainwright</u>, 477 U.S. 399, 405 (1986)) (leaving "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.").

AEDPA, however, the state habeas court's decision may not be disturbed unless it "was contrary to . . . clearly established Federal law, *as determined by the Supreme Court of the United States*." 28 U.S.C. § 2254(d) (emphasis added). The Petitioner has not cited any Supreme Court case clearly establishing that Georgia's beyond a reasonable doubt standard is unconstitutional.[3] See Hill v. Humphrey, 662 F.3d 1335, 1338 (11th Cir. 2011) ("[I]n the 219-year history of our nation's Bill of Rights, no United States Supreme Court decision has ever suggested, much less held, that a burden of proof standard on its own can so wholly burden an Eighth Amendment right as to eviscerate or deny that right."). Thus, the state habeas court's application of Georgia's "beyond a reasonable doubt" standard was not contrary to clearly established federal law.

Next, the Petitioner argues that this Court may review the state habeas court's factual findings de novo because the state habeas court failed to provide a full and fair review of Fults' claim. See 28 U.S.C. § 2254. Specifically, the Petitioner claims that the state habeas court "failed to consider" affidavit evidence supporting Fults' mental

---

[3]Fults notes that Hill v. Shofield, 625 F.3d 1313 (11th Cir. 2010), is currently awaiting rehearing *en banc* by the Eleventh Circuit. "[A] district court evaluating a habeas petition under § 2254(d) should 'survey the legal landscape' *at the time the state court adjudicated* the petitioner's claim to determine the applicable Supreme Court authority." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998) (emphasis added).

retardation claim.  (Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 32.)  To the contrary, the state habeas court admitted affidavits from the Petitioner's family and others.  The court, however, specifically found that evidence to be "not credible." (Res. Ex. 83, at 59.)  Thus, the state habeas court considered Fults' evidence in support of his mental retardation claim, but found that evidence unreliable and ultimately unpersuasive.  Indeed, the state habeas court is not required to adopt the Petitioner's evidence in order to provide a full and fair hearing.  For this reason, the state habeas court's findings are entitled to deference under 28 U.S.C. § 2254.

Next, Fults contends that the state habeas court misapplied the diagnostic criteria for determining mental retardation.  (See Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 36.)  With respect to the standard for determining mental retardation, the state habeas court noted that:

> The essential features of mental retardation are (i) significantly subaverage general intellectual functioning, (ii) resulting in or associated with impairments in adaptive behavior, and (iii) manifestation of this impairment during the developmental period. O.C.G.A. § 17-7-131 (a)(3).
> . . .
>
> "Significantly subaverage intellectual functioning" is generally defined as an IQ of 70 or below. DSM III, supra at 36. However, an IQ test score of 70 or below is not conclusive. At best, an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate. Moreover, persons "with IQs somewhat lower than 70" are not diagnosed as being mentally retarded if there "are

no significant deficits or impairment in adaptive functioning." DSM III,
supra at 37.

(Res. Ex. 83, at 54.)  The Petitioner does not claim that this was an incorrect standard

under Atkins.   Rather, Fults contends that the state habeas court relied on the

testimony of Dr. Karen Bailey-Smith and "inexplicably ignored or summarily rejected

. . . evidence of Mr. Fults's life-long impairment, instead focusing on isolated

strengths in Mr. Fults's abilities."  Based on this contention, the Petitioner claims that

the state habeas court made an "unreasonable determination of the facts."  28 U.S.C.

§ 2254(d).

        In the state habeas court, Dr. Karen Bailey-Smith, a psychologist who evaluated

Fults, testified that the Petitioner had an IQ of 74.  (Res. Ex. 12, at 1385.)  She further

testified that the Petitioner's IQ as measured may have been lowered because he

dropped out of school in seventh or eighth grade.  (Id. at 1386.)  Dr. Bailey-Smith

testified that Fults' communication and interpersonal skills were normal and that he

had "street smarts."  (Res. Ex. 56, at 499.)  Finally, Dr. Bailey-Smith opined that Fults

was not mentally retarded.  (Id.)

        As discussed above, the Petitioner presented evidence from family, friends, and

former teachers.  Much of this evidence indicated that Fults suffered from deficits in

adaptive functioning.  The Petitioner also presented expert testimony from Dr. Jethro

Toomer.  Dr. Toomer indicated that Fults had significant mental defects, especially in the area of communication.

Ultimately, the state habeas court concluded that Fults was not mentally retarded.  (See Res. Ex. 83, at 60.)  As discussed above, the state habeas court did not ignore or "summarily reject" the Petitioner's evidence.  Rather, the court accepted and relied upon the testimony of Dr. Bailey-Smith.  Conversely, the court found that "the affidavits of family and friend [sic] and the expert testimony of [Fults' expert] Dr. Jethro Toomer" to be "not credible."  (Res. Ex. 83, at 59.)  To the extent Dr. Toomer's testimony conflicts with Dr. Bailey-Smith's, the state habeas court is charged with reconciling just such conflicts.  Although the Petitioner disagrees with the state court's conclusions, this Court cannot overturn those factual determinations simply because the state habeas court *incorrectly* weighed the evidence.  Wiggins v. Smith, 539 U.S. 510, 520 (2003).  Rather, the Petitioner must show by clear and convincing evidence that the court's findings were "objectively unreasonable."  Id. at 521; 28 U.S.C. § 2254(e)(1).

With respect to the "[s]ignificantly subaverage intellectual functioning" prong of the mental retardation analysis, the Diagnostic and Statistical Manual, Fourth Edition, Third Revision ("DSM-IV-TR") defines "[s]ignificantly subaverage general intellectual functioning [as] an IQ of approximately 70 or below on an individually

administered IQ test."  DSM-IV-TR.  Here, the Petitioner admits that Fults scored above 70 on two out of three separately administered IQ tests.  (See Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 16.)  The only test on which Fults scored below 70 was the Test of Non-Verbal Intelligence ("TONI").  (Res. Ex. 55, at 216.)  The TONI, however, is not considered sufficient for diagnoses of mental retardation under the DSM-IV.  (Id. at 217-18.)  It was therefore not unreasonable for the state habeas court to discount this result.  Further, Fults scored 72 on the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), the only full-scale intelligence test Fults completed.  (See Res. Ex. 55, at 361.)  Dr. Bailey-Smith testified that Fults functioned with an IQ in the upper seventies.  (Res. Ex. 12, at 1386.)  Indeed, Fults' own expert, Dr. Jethro Toomer, testified that Fults' WAIS-III score might have been higher given more accurate scoring.  (See Res. Ex. 55, at 321-335.)

Fults notes, however, that the margin of error inherent in IQ tests may cause mildly retarded individuals to score as high as 75.  A margin of error, however, is as likely to produce artificially low results as artificially high results.  Based on the testimony of Dr. Bailey-Smith and Dr. Toomer, along with Fults' IQ test results, it was not unreasonable for the state habeas court to find reasonable doubt that Fults did

not suffer from significantly subaverage intellectual functioning.[4]  Thus, although there was evidence before the state habeas court indicating that Fults may be mentally impaired, the state habeas court found that Fults had not shown beyond a reasonable doubt that he was mentally retarded.  The Petitioner has not shown by clear and convincing evidence that this determination was unreasonable.

      B.    <u>Claim IV and V: Ineffective Assistance of Appellate Counsel</u>

The Petitioner argues that Mr. Sturdivant provided ineffective assistance of appellate counsel by failing to present mitigation evidence in support of Fults' ineffective assistance of trial counsel claim.  Specifically, Fults argues that Mr. Sturdivant was ineffective for not raising Mr. Mostiler's failure to introduce evidence of childhood abuse and mental retardation.[5]  The Sixth Amendment guarantees the right to counsel in all criminal prosecutions.  <u>See</u> U.S. CONST. amend VI.  "The right to counsel is the right to the effective assistance of counsel."  <u>Strickland v.</u>

---

    [4]Having found that it was not unreasonable to determine that Fults' IQ was above 70, the Court need not address the state habeas court's findings with respect to the other two criteria.  <u>See</u> DSM-IV-TR (defining significantly subaverage general intellectual functioning as IQ of approximately 70 or below); O.C.G.A. § 17-7-131 (a)(3) ("Mentally retarded" means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period.).

    [5]Fults makes a similar argument with respect to mental retardation in Claim VI of the Amended Complaint.

<u>Washington</u>, 466 U.S. 668, 686 (1984). "To establish ineffective assistance of counsel, the defendant must prove: (1) that counsel's performance fell below an objective standard of reasonableness . . . and (2) that the deficient performance prejudiced the defense, which requires a showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Williams v. Taylor</u>, 529 U.S. 362, 363 (2000) (citing <u>Strickland</u>, 466 U.S. at 694). This standard applies to appellate counsel as well. <u>See</u> <u>Penson v. Ohio</u>, 488 U.S. 75, 85 (1988) ("The need for forceful advocacy does not come to an abrupt halt as the legal proceeding moves from the trial to appellate stage."). "[W]hen appellate counsel's performance is claimed to be deficient because of a failure to assert an error on appeal, the reviewing court should resolve whether the decision was a reasonable tactical move which any competent attorney in the same situation would have made, by comparing the strength of the errors raised against the significance and obviousness of the alleged error passed over." <u>Battles v. Chapman</u>, 269 Ga. 702, 704-705 (1998).

With respect to Mr. Sturdivant's deficient performance, the state habeas court found:

> The evidence before this Court regarding Mr. Sturdivant's failure to present the issue of mitigation shows that Mr. Sturdivant never even considered it. Mr. Sturdivant simply read the trial transcripts and reviewed the file. He did not request any additional documents, including

school records and medical records. He did not ask Petitioner any questions about his background.  When asked if he had any concerns about what mitigation evidence Mr. Mostiler presented during the sentencing phase of Petitioner's case, he replied, "As I recall, there were no notes in the file as to – about Mr. Mostiler as to what he investigated or whatever circumstances there were. So I just assume he didn't have any [mitigation evidence] from the facts of the transcript." Mr. Sturdivant testified that he raised "anything he could attack" on direct appeal.

When taken as a whole, these excerpts from Mr. Sturdivant's deposition testimony can only lead this Court to one conclusion: that Mr. Sturdivant's failure to raise the issue of mitigation on appeal was never the result of a decision or a choice, but would be more accurately be described as an unreasonable oversight amounting to deficient performance.

(Res. Ex. 83, at 31.)  The state habeas court went on to conclude, however, that Fults suffered no prejudice from Mr. Sturdivant's deficient performance.  Specifically, the state habeas court found that "[t]he result of the appeal would have been the same had appellate counsel raised the issue of ineffective assistance of trial counsel regarding mitigation."  (Id., at 49.)  Thus, to determine whether Mr. Sturdivant's deficient performance prejudiced Fults, the Court must determine whether Mr. Mostiler provided ineffective assistance of counsel at trial.[6]

---

[6]The Court will address the prejudice prong of the Petitioner's ineffective assistance of appellate counsel claim before addressing, if necessary, the state habeas court's conclusion that Mr. Sturdivant's performance was deficient.  See Smith v. Robbins, 528 U.S. 259, 286 n.14 (2000) (quoting Strickland, 466 U.S. at 697) ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

1.     28 U.S.C. § 2254(d)(1)

First, the Petitioner argues that the state habeas court's prejudice finding was "contrary to and an unreasonable application of clearly established Supreme Court law." (Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 51.)  Specifically, the Petitioner contends that the state habeas court did not apply the "reasonable probability" standard to its prejudice analysis.  See Williams, 529 U.S. at 363 (citing Strickland, 466 U.S. at 694) (prejudice "requires a showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").  The Petitioner notes that the state habeas court found that Mr. Mostiler "had a strategy to present mental illness, attempted to humanize Petitioner, attempted to show he had good characteristics, and that he was accepting responsibility for his actions and apologizing for those actions, and as trial counsel supported that theory with the above witnesses." (Res. Ex. 83, at 49.)  Based on these findings, Fults argues that the state habeas court improperly determined that Mostiler's presentation of *some* mitigation evidence rendered trial counsel's performance sufficient.  To the contrary, the mitigation evidence presented by trial counsel was not determinative of the state habeas court's inquiry.  Rather, the mitigation evidence Mr. Mostiler did present merely informed the state habeas court's conclusion that "[t]he result of the appeal *would have been the same* had appellate

counsel raised the issue of ineffective assistance of trial counsel regarding mitigation." (Id., at 49) (emphasis added); see also Williams, 529 U.S. at 363 (citing Strickland, 466 U.S. at 694) (prejudice "requires a showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").  After discussing the efforts made by Mr. Mostiler in investigating and presenting mitigation evidence, the state habeas court correctly applied the "reasonable probability" standard to determine that "[t]he result of the appeal would have been the same" had appellate counsel not been deficient.  (Res. Ex. 83, at 49.) If anything, the state habeas court's conclusion indicates *more than* a reasonable probability that the result of Fults' appeal would not have been different.  For this reason, the state habeas court's prejudice determination was not contrary to clearly established Supreme Court law.

The Petitioner also contends that the state habeas court unreasonably applied Supreme Court law.  In Rompilla v. Beard, 545 U.S. 374 (2005), the petitioner's counsel failed to review the petitioner's criminal file.  That file included important mitigation evidence.  Further, opposing counsel specifically alerted the defendant's attorney that the prosecution planned to introduce the file at trial.  Here, the Petitioner does not claim that Mr. Mostiler failed to discover mitigation evidence in Fults'

criminal file or in documents central to the case.  Rather, the Petitioner contends that trial counsel failed to interview a list of potential mitigation witnesses.[7]

In Williams v. Taylor, 529 U.S. 362 (2000), the petitioner's counsel did not prepare for sentencing until one week before trial.  The defendant's counsel also failed to introduce evidence that the petitioner was borderline mentally retarded and had dropped out of school in sixth grade.  The Court found that trial counsel's investigation was deficient.  Here, as discussed below, the state habeas court found that Mr. Mostiler began work on the sentencing phase of trial as early as March 19, 1996.  (Res. Ex. 83, at 35.)  Further, the state habeas court found that Mr. Mostiler investigated Fults' childhood extensively, interviewing family members and friends.  At trial, Mr. Mostiler elicited evidence that Fults had an IQ of 74 and that he had dropped out of school in seventh grade.  (Res. Ex. 12, at 1385-1386.)  Thus, Williams and Rompilla are distinguishable from the facts of this case.  Wiggins, 539 U.S. at 511

---

[7]By contrast, in Williams v. Head, 185 F.3d 1223 (11th Cir. 1999), the Eleventh Circuit found that the petitioner's counsel had performed a sufficient mitigation investigation despite failing to interview the petitioner's father or sister. The court reasoned that "[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called," but "the existence of such affidavits, artfully drafted though they may be, usually proves little of significance." Id. at 1236 (quoting Waters v. Thomas, 46 F.3d 1506, 1513-14 (11th Cir. 1995)).  The court noted that "[i]n retrospect, one may always identify shortcomings, but perfection is not the standard of effective assistance."  Id. (internal quotations omitted).

("[T]he state court decision must have been 'objectively unreasonable,' not just incorrect or erroneous.").

Finally, the Petitioner cites Ferrell v. Hall, 640 F.3d 1199 (11th Cir. 2011).[8] Ferrell, however, is not Supreme Court precedent.  See Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) ("Clearly established federal law is not the case law of the lower federal courts, including this Court.").  Also, Ferrell was decided after the state habeas court denied Fults' petition.  See Neelley, 138 F.3d at 923 ("[A] district court evaluating a habeas petition under § 2254(d) should 'survey the legal landscape' at the time the state court adjudicated the petitioner's claim to determine the applicable Supreme Court authority.") (emphasis added).  In any event, Ferrell is distinguishable.  In Ferrell, the petitioner manifested obvious mental disabilities, including blank, glazed over looks, extreme religious beliefs, hearing voices from God, and exhibiting a strange, inappropriate demeanor at trial.  Indeed, the petitioner's first lawyer noted that the petitioner "suffered from mental health problems that were 'overt and fairly apparent to anyone who cared to look closely.'"  Ferrell, 640 F.3d at

---

[8]The Petitioner also cites Sears v. Upton, 130 S. Ct. 3259 (2010), and Porter v. McCollum, 130 S. Ct. 447 (2009).  Neither of those cases had been decided at the time of the Petitioner's state habeas proceeding.  They cannot, therefore, form the basis of a claim under § 2254(d)(1).  See Neelley, 138 F.3d at 923 ("[A] district court evaluating a habeas petition under § 2254(d) should 'survey the legal landscape' *at the time the state court adjudicated the petitioner's claim* to determine the applicable Supreme Court authority.") (emphasis added).

1228.  Further, the petitioner's mother had a history of mental illness.  Perhaps most significantly, "during the trial itself, [the petitioner] had a seizure, causing him to fall onto the floor, shake and speak gibberish."  Id.  In the face of such direct evidence, the Eleventh Circuit found that trial counsel was deficient for failing to make an inquiry into the petitioner's mental disabilities.

Here, the Petitioner manifested none of the obvious signs of mental disability present in Ferrell.  Indeed, the state habeas court found that trial counsel obtained copies of Fults' medical records, birth records, Georgia Bureau of Investigation file, and jail records.  (Res. Ex. 83, at 38.)  Unlike the petitioner in Ferrell, Fults did not exhibit outward signs of mental disability.  Further, unlike in Ferrell, Fults' medical and family history did not include obvious signs of mental illness and brain injury.  See Ferrell, 640 F.3d at 1228 (noting trial counsel's investigation failed to uncover history of multiple head injuries, seizures, and mother's history of mental health problems).

Trial counsel's investigation *did* reveal that Fults suffered from seizures as a child.  Indeed, Dr. Bailey-Smith testified that Fults suffered from seizures but eventually outgrew them.  Further, Dr. Bailey-Smith testified that such childhood seizures would not affect a mental health diagnosis.  (Res. Ex. 56, at 504.)  Finally, unlike in Ferrell, Fults' trial counsel *did* investigate and elicit evidence that Fults was

clinically depressed and did not always understand the consequences of his actions. (Res. Ex. 83, at 42.)  Thus, the facts of this case are not "materially indistinguishable" from <u>Ferrell</u>.  <u>Williams</u>, 529 U.S. at 405.  For this reason, the state habeas court's decision was not an unreasonable application of clearly established federal law.

        2.    <u>2254(d)(2)</u>

Next, Fults contends that the state habeas court's decision was "premised upon an unreasonable determination of the facts in light of the record." (Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 51.)  Specifically, the Petitioner contends that the state habeas court's unreasonable factual determinations caused it to erroneously conclude that Mr. Mostiler's investigation and presentation of mitigation evidence met the <u>Strickland</u> standard.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88 ("When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.").

The state habeas court found that Mr. Mostiler's investigation began with an interview that Mr. Mostiler conducted with Fults at the Spalding County Jail.  (Res. Ex. 83, at 35.)  Reviewing Mr. Mostiler's billing records, the state habeas court found that trial counsel began discussing the penalty phase of Fults' case as early as March 19, 1996.  (<u>Id.</u>; Res. Ex. 58, at 1029.)  Again, relying on billing records, the state

habeas court found that Mr. Mostiler met with the Petitioner numerous times to discuss Fults' background and childhood.  (Res. Ex. 83, at 35; Res. Ex. 56, at 474-477.)  Dewey Yarbrough, an investigator who worked with Mr. Mostiler on Fults' case, testified that during these meetings, the Petitioner revealed that he had experienced childhood seizures and fevers.  (Res. Ex. 83, at 36.)  Mr. Yarbrough also testified that he would have asked about childhood abuse during these meetings.  (Res. Ex. 56, at 477.)  Mr. Yarbrough further testified, and the state habeas court found, that trial counsel sought to contact Fults' family and friends, including Fults' aunt, a former girlfriend, and a running buddy.  (Id. at 36-37.)  Notably, the state court credited Mr. Yarbrough's testimony that he and Mr. Mostiler had contacted Fults' mother on several occasions.  (Id.; Res. Ex. 60, at 3102, 3105, 3106, 3109.)

A psychologist, Dr. Karen Bailey-Smith was available to testify on behalf of the Petitioner.  During her mental evaluation, Dr. Bailey-Smith testified that she questioned Fults extensively on his social history.  (Res. Ex. 56, at 496.)  Dr. Bailey-Smith testified that during these sessions, she would have asked about childhood abuse.  (Id.)  Dr. Bailey-Smith did not remember the Petitioner mentioning any childhood abuse.  (Id.)

Importantly, the state habeas court found that "[a]lthough trial counsel may have conducted more investigation, Mr. Mostiler died long before the habeas corpus

proceedings in this case, so it is impossible to determine all the investigation that he conducted." (Res. Ex. 83, at 38.) In Williams v. Allen, 598 F.3d 778 (11th Cir. 2010), the habeas petitioner argued that his trial counsel should have elicited testimony from an expert to establish an intoxication defense. The petitioner did not call trial counsel to testify and there was "no evidence as to whether trial counsel investigated additional experts, or why trial counsel chose not to offer additional experts." Id. at 794. The court held that "[a]n ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of counsel's competency. Therefore, where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." Id. (quoting Chandler v. U.S., 218 F.3d 1305, 1314 n.15 (11th Cir. 2000)).

Here, the state habeas court credited the testimony of Mr. Yarbrough. The court also relied on Mr. Mostiler's billing records and notes. Importantly, given the somewhat ambiguous record, the court employed the presumption that Mr. Mostiler's performance was sufficient. See Williams v. Head, 185 F.3d 1223, 1227 (11th Cir. 1999) ("Recognizing the strength and applicability of the presumption that counsel rendered effective assistance, the district court correctly refused to turn that

presumption on its head by giving [the petitioner] the benefit of the doubt where it is unclear what [trial counsel] did or did not do.") (internal quotations omitted).

The Petitioner now, however, identifies a number of witnesses that were never contacted by trial counsel. (See Doc. 60, at 59 n.26.) Fults claims that these witnesses could have provided further mitigation evidence. As discussed above, however, "'[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called,' but 'the existence of such affidavits, artfully drafted though they may be, usually proves little of significance.'" Williams, 185 F.3d at 1236 (quoting Waters v. Thomas, 46 F.3d 1506, 1513-14 (11th Cir. 1995)). "[I]n retrospect, one may always identify shortcomings, but perfection is not the standard of effective assistance." Id. (internal quotations omitted). Further, to the extent Mr. Mostiler's investigation could have been more extensive, "choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 691. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. As discussed above, substantial information available to trial counsel, including Fults' IQ test results and the testimony of Dr. Karen Bailey-Smith, did not support a diagnosis

of mental retardation.  For these reasons, the Petitioner has not shown by clear and convincing evidence that the state habeas court's determination regarding trial counsel's investigation was an unreasonable determination of the facts.

Next, the Petitioner argues that the state habeas court unreasonably determined that Mr. Mostiler's presentation of mitigation evidence was not deficient.  At trial, Mr. Mostiler presented evidence that the Petitioner suffered from depression and that he did not always understand the full implications of his actions.  (Res. Ex. 12, at 1395.) Dr. Karen Bailey-Smith testified that Fults' depression could have had an effect on his behavior.  (Id. at 1390.)  Mr. Mostiler also presented evidence seeking to portray Fults in a positive light.  At trial, the Petitioner accepted responsibility for his actions.  (Res. Ex. 13, at 1442.)  Further, Mr. Mostiler presented evidence about Fults' early life, including that the Petitioner dropped out of school in seventh grade and that he had no relationship with his father. (Id. at 1444.)  Fults testified that he moved frequently during his childhood and that he did not get along with his mother and her husband. (Id. at 1452-1453.) Finally, Fults apologized to the victim's mother for murdering her daughter.  (Id. at 1504.)  Mr. Mostiler also called the Petitioner's aunt, ex-girlfriend, sister, uncle, and mother to testify on his behalf.  Fults' mother explained his nonexistent relationship with his father.  These witnesses uniformly attempted to humanize Fults. (See id. at 1661-1663.)

The Petitioner, however, asserts that Mr. Mostiler was deficient for failing to introduce evidence of mental retardation.  As discussed above, the state habeas court's conclusion that Fults was not mentally retarded was not unreasonable.  It was therefore not unreasonable for the state habeas court to conclude that trial counsel was not deficient for failing to present such unpersuasive evidence.  Nevertheless, Fults contends that Mr. Mostiler should have presented weak or unpersuasive evidence of mental retardation as mitigation.  Mr. Mostiler *did* present evidence that Fults had an IQ of 74, suffered from depression, and did not always understand the consequences of his actions.  (See Res. Ex. 12, at 1385, 1386, & 1395.)  To the extent the Petitioner suggests Mr. Mostiler was deficient for failing to introduce unpersuasive evidence of mental retardation, trial counsel is not required to put on all mitigation evidence regardless of its credibility.  See Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995).  As discussed above, it was not unreasonable for the state habeas court to conclude that Fults' evidence of mental retardation was unreliable.  For these reasons, Mr. Mostiler was not deficient for failing to introduce evidence of mental retardation which did not exist.

Finally, the Petitioner claims that Mr. Mostiler should have introduced evidence of childhood abuse.  The state habeas court, however, found the Petitioner's evidence of childhood abuse unpersuasive.  Indeed, there was significant evidence presented

at trial that Fults was not abused.  Mr. Yarbrough testified that it was standard procedure to ask about childhood abuse.  (Res. Ex. 56, 474-476.)  Mr. Yarbrough further testified that he would have noted any abuse if it had been reported.  (Id. at 477.)  Mr. Mostiler's file, however, contains no record of childhood abuse.  See Williams, 598 F.3d at 794 (quoting Chandler, 218 F.3d at 1314 n.15) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of counsel's competency. Therefore, where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.").  Further, Dr. Bailey-Smith testified that it was her practice to inquire about physical abuse, but she did not remember any allegations of abuse.  (Res. Ex. 56, at 504.)

The Petitioner, however, contends that the state habeas court improperly ignored the testimony of Fults' expert, Dr. Patrice Harris, Fults' mother, and Tamiko Jackson-Wright, the Petitioner's sister.  These witnesses testified in the state habeas case that the Petitioner had been abused as a child.  The state habeas court found that this evidence was not credible, noting that Ms. Harris admitted that Fults never used the term "abuse" during her investigation.  (Res. Ex. 83, at 51.)  Further, the state habeas court was "not persuaded that Ms. Jackson-Wright's testimony, considering her age, her vagueness about dates and times, and change in testimony from trial,

would have changed the outcome of Petitioner's trial." (<u>Id.</u>)  Given Mr. Yarbrough and Dr. Bailey-Smith's testimony to the contrary, the state habeas court's credibility determination regarding Ms. Jackson-Wright was not unreasonable.  Evaluating all the evidence, the state habeas court determined that the Petitioner was not abused as a child.

Similarly, the state habeas court found that "unbiased documentation undermines Petitioner's claims of neglect." (<u>Id.</u>, at 52.)  During the state habeas proceeding, Fults' sister and brother described incidents in which Fults was left home alone for extended periods of time.  Again, the state habeas court found that Ms. Jackson-Wright's testimony was "unreliable and biased." (<u>Id.</u>, at 53.) This credibility determination is within the purview of the state habeas court.  <u>See</u> 28 U.S.C. § 2254(e)(1).  Indeed, the state habeas court reasoned that Mr. Jackson-Wright's "vagueness about dates and times, and change in testimony from trial," discredited her testimony.  (Res. Ex. 83, at 51.)  In light of such inconsistencies, it was not unreasonable for the state habeas court to discount her testimony.

Further, the state habeas court found that neither the Petitioner nor his family told Mr. Mostiler about alleged abuse before trial.  (Res. Ex. 83, at 51.)  As discussed above, the state habeas court reasonably determined that Mr. Mostiler met with Fults several times, as well as contacting Fults' mother, family members, and friends.  (<u>See</u>

Res. Ex. 83, at 35-39.)  Mr. Yarbrough testified that he and Mr. Mostiler would have asked questions about childhood abuse, but that there were no notations to that effect in the records.  (Res. Ex. 56, at 477.)  "An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him." Williams, 185 F.3d at 1237.  It was not unreasonable for the state habeas court to conclude that despite an intensive investigation, neither Fults nor his family told trial counsel about childhood abuse.  It was therefore not unreasonable to conclude that trial counsel was not deficient in failing to investigate and present evidence of abuse and neglect.  For all these reasons, the state habeas court's determination that trial counsel was not ineffective for failing to present additional mitigation evidence at trial was not an unreasonable determination of the facts.

> C.   Claim VI: Failure to Investigate and Present Mental Retardation Claim

In Claim VI of the Amended Complaint, Fults contends that Mr. Sturdivant was ineffective for failing to investigate and present evidence of mental retardation.  The Court will address the prejudice prong of Fults' ineffectiveness claim first.  See Smith, 528 U.S. at 286 n.14 (quoting Strickland, 466 U.S. at 697) ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so,

that course should be followed.'"). Here, as discussed above, Fults has not shown that the state habeas court's determination that he was not mentally retarded was unreasonable. Thus, it was not unreasonable for the state habeas court to conclude that Fults was not prejudiced by Mr. Sturdivant's failure to introduce evidence of mental retardation. Indeed, appellate counsel need not introduce meritless claims to provide effective assistance.

Nevertheless, the Petitioner contends that even if he has not shown that he is mentally retarded beyond a reasonable doubt, Mr. Sturdivant should have introduced evidence of mental retardation as evidence of "lifelong impairment." (See Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 115.) First, the Petitioner argues that the state habeas court made an unreasonable determination of the facts. Specifically, Fults disputes the state habeas court's finding that Mr. Mostiler consulted with a psychologist, "Dr. Atkinson," regarding mental retardation. (Res. Ex. 83, at 54-55.) The Petitioner contends that "Dr. Atkinson" is actually "Dr. Adkison" and that she is a DNA expert. (Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 109-110.)

At the state habeas court, Mr. Yarbrough testified that he was "99.9 percent sure" that he and Mr. Mostiler contacted a mental health expert. (Res. Ex. 60, at 3089-90.) He believed that expert was Dr. Atkinson. (Id. at 3108.) The Petitioner did not present any evidence regarding the true identity of Dr. Adkison at the state habeas

court.  Where the Petitioner has failed to present evidence at a prior state court proceeding, he must show that the "factual predicate" was not available through due diligence and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2254(e)(2)(A)(ii) & (B).  Here, the identity of Dr. Adkison could have been discovered before the state habeas proceeding.  Thus, in light of the evidence presented in the State court proceeding, the state habeas court's determination was not an unreasonable determination of the facts.[9]

Next, the Petitioner claims that the state habeas court unreasonably applied Supreme Court law.  The state habeas court determined that "Mr. Mostiler clearly considered [the information indicating mental retardation] and made a strategic decision to call Dr. Bailey-Smith at trial in mitigation, but not to present a weak claim

---

[9]In any event, the state habeas court did not explicitly find that trial counsel consulted with "Dr. Atkinson."  Rather, the state habeas court summarized that "Investigator Yarbrough testified that he thought Dr. Atkinson, whom the timesheets establish was contacted by the defense team, was the doctor that handled their independent psychological evaluation."  (Res. Ex. 83, at 55.) Even if Dr. Adkison did not consult with trial counsel regarding mental retardation, the state habeas court clearly credited Mr. Yarbrough's testimony that he and Mr. Mostiler contacted *some* mental health expert.  Given this testimony, along with the presumption that trial counsel performed competently, the Court cannot conclude that the state habeas court's factual determination was unreasonable.  (Id.)

of mental retardation." (Res. Ex. 83, at 55.)  As discussed above, there was significant evidence that Fults was not mentally retarded.  Specifically, Fults scored above 70 on two out of three IQ tests.  (See Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 16.)  Dr. Karen Bailey-Smith testified that Fults was not mentally retarded. (Res. Ex. 56, at 498-99.)  As discussed above, the state habeas court credited the testimony of Mr. Yarbrough that Mr. Mostiler had contacted a psychiatric expert.

Nevertheless, the Petitioner argues that other witnesses, including Dr. Jethro Toomer, could have testified in support of Fults' "lifelong impairment" claim.  The state habeas court, however, found the testimony of Fults' family and friends, as well as the testimony of Dr. Toomer, to be "not credible."  (Res. Ex. 83, at 59.)  Given the conflicting testimony from Dr. Karen Bailey-Smith, this credibility determination was not unreasonable.  Further, the Sixth Amendment does not require counsel to "shop for a psychiatrist who will testify in a particular way."  Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987); see also, Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) ("[T]he Supreme Court and this Court in a number of cases have held counsel's performance to be constitutionally sufficient when no mitigating circumstance evidence at all was introduced, even though such evidence, including some relating to the defendant's mental illness or impairment, was available.").  Indeed, because it was not unreasonable to conclude that Fults was not mentally retarded, it was not

unreasonable to conclude that Fults' counsel acted reasonably by declining to introduce a weak mental retardation claim. For these reasons, it was not an unreasonable application of Supreme Court law[10] to determine that Fults was not prejudiced by Mr. Sturdivant's failure to investigate and present evidence of mental retardation.

> D.   Claim II: Trial Counsel's Failure to Object to Racist Gang Evidence

In Claim II of the Amended Petition, the Petitioner argues that trial counsel was ineffective for failing to object to evidence that Fults was a member of a racist gang. (See Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 119.) At trial, the state introduced evidence that Fults was a member of the Black Gang Disciples. (See Res. Ex. 12 at 1303-1325.) Further, A.J. Pharmalee, a police detective, testified about the history and characteristics of the gang. Mr. Pharmalee also described certain gang codes. (Id.) With respect to this claim, the Georgia Supreme Court stated:

> As we have noted before, "the circumstances of the offense are relevant both to guilt and to sentence." Ford v. State, 257 Ga. 461, 463(1), 360 S.E.2d 258 (1987). Although Fults had pled guilty, evidence of his crimes was relevant both to dispel any lingering doubts jurors might have and to demonstrate the aggravated nature of the crimes. The boastful letter about the murder written in gang code, the evidence that Fults was attempting to direct the activities of a gang from jail, and the

---

[10]The Petitioner relies on Brownlee v. Haley, 306 F.3d 1043 (11th Cir. 2002). Brownlee was decided by the Eleventh Circuit and is therefore not Supreme Court precedent for purposes of § 2254(d)(1).

general evidence about the gang which placed this other evidence in context likewise were all relevant in the sentencing phase.

"Failure to make a meritless objection cannot be evidence of ineffective assistance." Hayes v. State, 262 Ga. 881, 884-885(3)(c), 426 S.E.2d 886 (1993); see Strickland, 466 U.S. at 687(III), 104 S.Ct. 2052; Smith, 253 Ga. at 783(1), 325 S.E.2d 362.  Accordingly, we conclude that Fults' trial counsel did not render ineffective assistance by failing to object to the admissible evidence concerning his crimes during the sentencing trial.

Fults v. State, 274 Ga. 82, 87 (2001).

The Petitioner claims that this holding unreasonably applied Dawson v. Delaware, 503 U.S. 159 (1992).  In Dawson, the state introduced evidence during sentencing that the defendant was a member of white racist prison gang.  The Court held that the introduction of the evidence was constitutional error, noting that the information was irrelevant to the defendant's sentencing proceeding.  Id. at 165. Importantly, the Court noted that the racist beliefs of the gang "[were] not tied in any way to the murder of [the defendant's] victim."  Id.  Indeed, the Court distinguished Barclay v. Florida, 463 U.S. 939 (1983), in which the defendant's membership in a racist gang was "related to the murder of a white hitchhiker."  Id. at 166.

Here, as in Barclay, but unlike Dawson, the Petitioner's membership in a racist gang was related to his crime.  Indeed, Fults wrote a confession in gang code. The jury was entitled to hear "all aspects" of Fults' crimes, including his confession, "to guide [it] in determining appropriate sentence."  Fair v. State, 245 Ga. 868, 871 (1980).

Because the confession was encoded, the prosecution called a gang expert to accurately decipher and explain the code to the jury.  Thus, unlike Dawson, the information about Fults' gang affiliation was not irrelevant to his sentencing.  For this reason, the state habeas court's application of Dawson was not "objectively unreasonable."  Wiggins v. Smith, 539 U.S. 510, 520 (2003).

> E.  Claim III: Trial Counsel's Workload

In Claim III of the Amended Petition, Fults argues that Mr. Mostiler's excessive workload deprived him of effective assistance of counsel [See Doc. 60, at 126].  In response to the Respondent's Motion to Dismiss, the Petitioner conceded procedural default with respect to Claim III [see Doc. 30 at 12].  The Court held that the procedural default was not excused by cause and prejudice [see id. at 18-19].  Nevertheless, the Petitioner argues that Mr. Mostiler's workload caused him to render ineffective assistance of counsel.  The Petitioner, however, does not present any newly discovered evidence, an intervening change in law, or a clearly erroneous decision by this Court.  See Godby v. Electrolux Corp., No. 1:93-CV-0353-ODE, 1994 WL 470220, at *1 (N.D. Ga. May 25, 1994) (party may move for reconsideration only by showing: "an intervening change in controlling law, the availability of new evidence, [or] the need to correct clear error or prevent manifest injustice.").  For this reason, the Court will not reconsider its determination that Claim III is procedurally defaulted.

F.      Claim II: Trial Counsel Slept During Trial

The Petitioner claims that Mr. Sturdivant provided ineffective assistance of counsel by failing to argue that Mr. Mostiler slept during trial [see Doc. 60, at 142]. "[S]leeping counsel is tantamount to no counsel at all." U.S. v. DiTommaso, 817 F.2d 201, 216 (2d Cir. 1987).  The state habeas court, however, found that the Petitioner "failed to establish by any unbiased and/or credible evidence that Mr. Mostiler was asleep during any portion of Petitioner's trial." (Res. Ex. 83, at 28.)  To support this conclusion, the court noted that Mr. Yarbrough "was present during the entire trial" and testified that Mr. Mostiler "never slept during Petitioner's trial."  Id.  The Petitioner contends that the state habeas court's conclusion was an unreasonable determination of the facts.  To support this claim, the Petitioner relies on the testimony of jurors and family members who claim to have seen Mr. Mostiler sleeping during trial.  Mr. Mostiler's associate, Rosamund Braunrot, also testified that Mr. Mostiler had a sleeping disorder and would sometimes fall asleep unexpectedly.  (See Res. Ex. 57, at 564-65.)  Ms. Braunrot was not present during the Fults trial.  Clearly, Mr. Yarbrough's testimony conflicts with that of several jurors, as well as Fults' family members.  The state habeas court, however, is charged with reconciling just such conflicting testimony.  As discussed above, that court found that testimony from Fults' family members and jurors was not credible.  Conversely, the state habeas court

credited Mr. Yarbrough's testimony.  Under 28 U.S.C. § 2254, the state habeas court

is charged with making factual determinations in the first instance.  See 28 U.S.C. §

2254(e)(1).  This Court cannot upset those determinations simply because they might

be incorrect.  Here, the Petitioner has not shown by clear and convincing evidence that

the state habeas court's findings of fact with respect to Mr. Mostiler's conduct at trial

were unreasonable.

      G.    Claim XXIII: Jury Instructions

The Petitioner claims that the jury instructions failed to properly explain the

meaning and significance of mitigation evidence.  At trial, the state court charged the

jury as follows:

> [I]n arriving at this determination you are authorized to consider all of
> the evidence received here in court in this sentencing phase presented by
> the State and the defendant throughout the trial before you … You shall
> also consider the facts and circumstances, if any, in extenuation,
> mitigation, or aggravation of punishment.

> Mitigation or extenuating facts or circumstances are those which you, the
> jury, find do not constitute a justification or excuse for the offense in
> question but which if in fairness and mercy may be considered as
> extenuating or reducing the degree of moral culpability or blame.

(Res. Ex. 14, at 1766-1767.)  The state habeas court found that this instruction was

proper.  (Res. Ex. 83, at 17.)  The Petitioner, however, claims that this determination

was an unreasonable application of <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989).[11]  In

<u>Penry</u>, the trial court presented to the jury three questions pursuant to the Texas death

penalty statute.   The questions, however, prevented the jury from considering

mitigation evidence, including the defendant's mental retardation and history of abuse.

The Court held that the instructions violated the defendant's Eighth and Fourteenth

Amendment rights.  The Court reasoned that "[t]he jury was never instructed that it

could consider the evidence offered by Penry as mitigating evidence and that it could

give mitigating effect to that evidence in imposing sentence."  <u>Id.</u> at 320.

Here, unlike in <u>Penry</u>, the trial court informed the jury that it could consider "all

of the evidence . . . presented by the State and the defendant."  (Res. Ex. 14, at 1766.)

Further, the trial court explicitly instructed the jury to "consider the facts and

circumstances, if any, in extenuation, *mitigation*, or aggravation of punishment."  (<u>Id.</u>

at 1767) (emphasis added).  The court then defined the mitigation evidence that the

jury was to consider.  (<u>See</u> <u>id.</u>)  Thus, unlike <u>Penry</u>, the trial court clearly instructed

the jury that it should consider mitigation evidence.  "[T]he state may shape and

structure the jury's consideration of mitigation so long as it does not preclude the jury

from giving effect to any relevant mitigating evidence."  <u>Buchanan v. Angelone</u>, 522

---

[11]The Petitioner also cites <u>Cunningham v. Zant</u>, 928 F.2d 1006 (11th Cir. 1991) and <u>Peek v. Kemp</u>, 784 F.2d 1479 (11th Cir. 1986).  Neither of these cases, however, are clearly established Supreme Court law for purposes of 28 U.S.C. § 2254(d).

U.S. 269, 276 (1998). Thus, the state habeas court's determination that the jury instructions were sufficient was not an unreasonable application of Supreme Court law. The Petitioner also argues that Mr. Mostiler's failure to object to the jury instructions and Mr. Sturdivant's failure to raise the issue on appeal constituted ineffective assistance of counsel. As the Petitioner's underlying claim is without merit, however, neither trial nor appellate counsel was deficient for failing to raise the issue.

H.    Claim XXII: Racial Bias in Jury Pool

The Petitioner argues that the jury was infected with racial bias, violating his right to a fair trial under the Sixth, Eighth, and Fourteenth Amendments. In its September 2, 2010 Order, this Court dismissed this claim as procedurally defaulted [see Doc. 30, at 19]. The Court specifically affirmed this ruling in its Order denying the Petitioner's Motion for Reconsideration [see Doc. 45, at 6-7]. The Petitioner has not shown any newly discovered evidence, an intervening change in controlling law, or a clearly erroneous decision by this Court. See Godby, 1994 WL 470220, at *1 (party may move for reconsideration only by showing: "an intervening change in controlling law, the availability of new evidence, [or] the need to correct clear error or prevent manifest injustice."). Indeed, the Petitioner makes many of the same arguments that the Court rejected in its February 4, 2011 Order. For this reason, the

Court declines to reconsider its decision that Claim XXII has been procedurally defaulted.

I.    <u>Claim XXIX: Proportionality</u>

The Petitioner argues that his sentence is disproportionate to his crime. Specifically, Fults contends that the Georgia Supreme Court failed to conduct a constitutionally required proportionality review.  O.C.G.A. § 17-10-35 requires that the Georgia Supreme Court determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  O.C.G.A. § 17-10-35(c)(3).  The Supreme Court has noted that Georgia's "proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury."  <u>Gregg v. Georgia</u>, 428 U.S. 153, 206 (1976).

Here, the Georgia Supreme Court found:

The evidence showed that Fults committed several burglaries to further his plan to murder a man and that during one of these burglaries he murdered Cathy Bounds. Fults committed the murder execution-style, firing five shots to the back of the victim's head as she lay face-down on her own bed, blinded by over six feet of electrical tape and smothered under a pillow. The evidence also showed that Fults had a history of criminal conduct in several states and that he had once claimed to have shot another man.

Evidence was presented by the State showing that Fults had been uncooperative with guards while in jail, resulting in his being physically compelled to cooperate on two occasions. Evidence also showed that

Fults had made death threats against a fellow inmate over a dispute involving $10. See Gissendaner, 272 Ga. at 718(19)(b), 532 S.E.2d 677 (considering post-arrest conduct in proportionality review).

We conclude, considering both the crime and the defendant, that the death sentence imposed for the murder in this case was neither excessive nor disproportionate to the penalties imposed in similar cases in Georgia. OCGA § 17-10-35(c)(3). The cases appearing in the Appendix support this conclusion in that each involved a deliberate murder during a kidnapping with bodily injury or during a burglary.

. . .

We find that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35(c)(1).

Fults v. State, 274 Ga. 82, 88 (2001).   In the appendix, the court cited twelve comparable cases in support of its conclusion that Fults' sentence was not disproportionate.  See id. at 87.

First, the Petitioner claims that the state court's decision is not entitled to deference under § 2254(d) because the Georgia Supreme Court failed to adjudicate the claim on the merits.   Although the Petitioner contends that the state court's adjudication was inadequate and truncated, the state court addressed the merits of the Petitioner's proportionality claim.  As discussed above, the Georgia Supreme Court found that Fults' sentence was proportionate to his crime.  Thus, the court's decision is entitled to deference under § 2254(d).

Next, the Petitioner contends that the state court's proportionality review was contrary to or an unreasonable application of Supreme Court law. Specifically, Fults claims that the Georgia Supreme Court's failure to compare similar cases in which the death penalty was not imposed rendered the court's analysis unconstitutional. In <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976), the Court upheld Georgia's capital sentencing scheme, noting that:

> the Georgia statute has an additional provision designed to assure that the death penalty will not be imposed on a capriciously selected group of convicted defendants. The new sentencing procedures require that the State Supreme Court review every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance, and [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

<u>Id.</u> at 204 (internal quotations omitted). Thus, both <u>Gregg</u> and O.C.G.A. § 17-10-35 anticipate that the Georgia courts will review similar cases and make specific findings. <u>Gregg</u> does not, however, explicitly require the state court to consider similar cases where the death penalty was not imposed.

Nevertheless, the Petitioner contends that <u>Walker v. Georgia</u>, 129 S. Ct. 453 (2008), requires that Georgia courts compare cases in which the death penalty was not imposed. In <u>Walker</u>, Justice Stevens argues that in approving Georgia's capital punishment scheme in <u>Gregg</u>, the Supreme Court "assumed that the court would

consider whether there were 'similarly situated defendants' who had not been put to death because that inquiry is an essential part of any meaningful proportionality review." Id. at 454.  The Court in Walker, however, denied the petitioner a writ of certiorari after finding that his proportionality claim had been procedurally defaulted. Indeed, Justice Stevens' accompanying statement is not precedent.  Nor is it "clearly established Federal law" for purposes of § 2254(d).[12]  28 U.S.C. § 2254(d)(1).

By contrast, in Pulley v. Harris, 465 U.S. 37 (1984), the Supreme Court reviewed Gregg and its progeny.  The Court noted that while appellate review was an important part of Georgia's capital sentencing scheme, "we did not hold that without comparative proportionality review the [Georgia] statute would be unconstitutional." Id. at 50.  Thus, the Georgia Supreme Court's proportionality review was not contrary to or an unreasonable application of Supreme Court law.

Finally, the Petitioner contends that the Georgia Supreme Court's proportionality review was an unreasonable determination of the facts.  Pursuant to O.C.G.A. § 17-10-35(c), the court addressed aggravating factors specific to Fults' case, including the heinous nature of his crimes, his past criminal behavior, and his

---

[12]The Petitioner also cites an article published in the *Atlanta Journal Constitution*.  (See Pet'r's Br. in Supp. of Pet'r's Pet. for Habeas Corpus, at 185-186.) To the extent this article criticizes Georgia's appellate review system, it is not clearly established federal law.

conduct while incarcerated.  The court also compared similar cases, and found that the sentence "was not imposed under the influence of passion, prejudice, or any other arbitrary factor."  Fults, 274 Ga. at 88.  The Petitioner has not shown by clear and convincing evidence that these conclusions were unreasonable determinations of the facts.

    J.    Claim X: Ineffective Assistance of State Habeas Counsel

    The Petitioner claims that his state habeas counsel was ineffective, depriving him of his right to counsel under the Sixth Amendment.  Generally, "there is no right to counsel in state collateral proceedings."  Coleman v. Thompson, 501 U.S. 722, 755 (1991).  In Coleman, Virginia law dictated that ineffective assistance of counsel claims could only be raised in state habeas proceedings.  The petitioner argued that he was entitled to counsel during appeal of his state habeas case.  The Court noted that "where the merits of *the one and only appeal* an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor."  Id. at 756 (quoting Douglas v. California, 372 U.S. 353, 357 (1963)); see also Halbert v. Michigan, 545 U.S. 605, 617 (2005) (finding right to counsel for discretionary first-tier review).  The Court, however, held that "there is no right to counsel in state collateral proceedings after exhaustion of direct appellate review."  Coleman, 501 U.S. at 756.

Here, Fults has exhausted his direct appellate review.  The Petitioner argues, however, that the state habeas proceeding was his first opportunity to present his ineffective assistance of appellate counsel claims.  The Petitioner's logic, however, would require never-ending appointment of counsel.  Indeed, at every stage of post conviction review, counsel would be required to argue the ineffectiveness of prior counsel "in the first instance."  The Supreme Court has explicitly limited the requirement of appointment of counsel to direct review.  <u>See</u> <u>id.</u> ("[A] criminal defendant has no right to counsel beyond his first appeal in pursuing state discretionary or collateral review.").  For this reason, Fults' ineffective assistance of state habeas counsel claim has no merit.

K.     <u>Claim XI: Voir Dire</u>

In his Amended Petition for Writ of Habeas Corpus, Fults claims that the trial court restricted his questioning during voir dire.  The Petitioner claims that "[p]rior to voir dire, the trial court struck a number of potential questions proposed by defense counsel" [Doc. 22, at 68].  Fults does not, however, specify which questions the court struck or why those questions were appropriate.[13]  Further, the Petitioner does not

---

[13]On direct appeal, the Petitioner contended that the trial court improperly prevented Mr. Mostiler from questioning a potential juror who had stated that she could not vote to impose the death penalty.  The trial court prohibited Fults' counsel from asking whether the juror understood that she would be voting as part of a jury. To the extent Fults claims this was error, the Georgia Supreme Court found that the

address this claim in his merits brief.  For these reasons, Fults has not shown that the state trial court violated his constitutional rights during voir dire.

IV.  <u>Conclusion</u>

For the reasons set forth above, the Court DENIES the Petitioner's Amended Petition for Writ of Habeas Corpus [Doc. 22].

SO ORDERED, this 14 day of March, 2012.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

---

trial court "correctly focused voir dire on the individual juror's ability to cast a vote for the death penalty under any circumstances." <u>Fults v. State</u>, 274 Ga. 82, 85 (2001). The Georgia Supreme Court's decision is therefore entitled to deference under § 2254(d).  The Petitioner has not shown that the Georgia Supreme Court's decision was contrary to, or involved an unreasonable application of federal law, or that it was an unreasonable determination of the facts.